IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


BRENDA P. ABRAMS,               )
                               )
           **Plaintiff,**       )
                               )
                               )     Civ. 09-41 Erie
                               )
**COMMISSIONER OF SOCIAL**   )
**SECURITY,**                  )
                               )
           **Defendant.**      )


## OPINION

This case is before us on appeal from a final decision by the defendant, Commissioner of Social Security ("the Commissioner"), denying plaintiff Brenda P. Abrams' claim for disability insurance benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401-434. The parties have submitted cross-motions for summary judgment. (Docs. 12 and 14). For the reasons stated below, the Plaintiff's motion for summary judgment is denied and Defendant's motion for summary judgment is granted.

### I. General Background

Ms. Abrams protectively applied for DIB on August 11, 2004, alleging disability since May 1, 2000, due to post-traumatic arthritis in her neck and shoulders. R. 118, 139. Plaintiff's date last insured for purposes of her DIB claim was December 31, 2005; thus, she had to establish that she was disabled on or before this date in order to be entitled to a period of disability and DIB. 42 U.S.C. § 423(a), (c); 20 C.F.R. § 404.131(a). Her application was initially denied, and she requested a hearing.

Ms. Abrams, represented by counsel, appeared and testified at an administrative hearing before an Administrative Law Judge ("ALJ") on June 21, 2007. R. 31. A vocational expert ("VE") also testified at the hearing. On August 14, 2007, the ALJ issued his decision denying DIB benefits and concluded that Ms. Abrams was "not disabled" under the Act. R. at 25.

The Appeals Council denied Ms. Abrams's request for review on December 19, 2008, (R.8-10), thereby making the ALJ's decision the final decision of the Commissioner.

Following the Appeals Council action, Ms. Abrams filed this action seeking judicial review of the ALJ's decision.

## II. **Standard of Review**

The standard of review in social security cases is whether substantial evidence exists in the record to support the Commissioner's decision. Knepp v. Apfel, 204 F.3d 78, 83 (3d Cir. 2000). "Substantial evidence has been defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate.'" Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) (quoting Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir.1999) (quoting Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir.1995)). Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently. Fargnoli, 247 F.3d at 38; 42 U.S.C. § 405(g).

"Under the Social Security Act, a disability is established where the claimant demonstrates that there is some 'medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period.'" Fargnoli, 247 F.3d at 38-39 (quoting Plummer, 186 F.3d at 427 (other citation omitted)); see also 20 C.F.R. § 404.1505(a). "A claimant is considered unable to engage in any substantial gainful activity 'only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .'" Fargnoli, 247 F.3d at 39 (quoting 42 U.S.C. § 423(d)(2)(A)).

The Commissioner has provided the ALJ with a five-step sequential evaluation process to be used when making this disability determination. See 20 C.F.R. § 404.1520. The United States Court of Appeals for the Third Circuit sets forth the five-step procedure as follows:

> In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity. 20 C.F.R. § [404.] 1520(a). . . . In step two, the Commissioner must determine whether the claimant is suffering from a severe

impairment. 20 C.F.R. § 404.1520(c). . . . In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work. 20 C.F.R. § 404.1520(d). If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work. 20 C.F.R. § 404.1520(d). The claimant bears the burden of demonstrating an inability to return to her past relevant work. Adorno v. Shalala, 40 F.3d 43, 46 (3d Cir.1994). If the claimant is unable to resume her former occupation, the evaluation moves to the final step. At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability. 20 C.F.R. § 404.1520(f). The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled.See 20 C.F.R. § 404.1523. The ALJ will often seek the assistance of a vocational expert at this fifth step. See Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir.1984).

Fargnoli, 247 F.3d at 39 (quoting Plummer, 186 F.3d at 428).

The claimant carries the initial burden of demonstrating by medical evidence that she is unable to return to his previous employment due to a medically determinable impairment. Dobrowolsky v. Califano, 606 F.2d 403, 406 (3d Cir.1979). Once the claimant meets this burden, steps one through four described supra, the burden of proof shifts to the Commissioner to show that the claimant can engage in alternative substantial gainful activity. Id.

## III. Factual History

Ms. Abrams was 49 years old on the date of her last insured, making her a "younger individual" as defined by the regulations. R. 24; 20 C.F.R. §§ 404.1563, 416.963(c). She has a high school education and past relevant work experience as an assembly line worker in a cigarette lighter factory. R. 44, 63.

### A. Medical history

Ms. Abrams medical history dates back to 1990, when she had arthroscopic surgery on her right shoulder. R. 231. Additional surgeries were performed in January 1996 and again in February 1998. R. 244. Gerard R. Williams, M.D., her treating physician, reported in February 1999 that her results were excellent. R. 251.

On April 3, 2000, Ms. Abrams' primary care internist opined that she should remain off

3

work for the next month, until May 2, 2000, due to right shoulder subluxation R. 259-60. He recommended that she work only intermittently or less than a full schedule, stating she was not able to perform repetitive movements. R. 259-60. In May he observed that her right shoulder pain had improved, again suggesting that she avoid repetitive movements. R. 367.

On October 30, 2000, Dr. Williams recommended that she not lift more than 20 pounds below shoulder height or 10 pounds above shoulder height, and further that she should not use her right arm more than occasionally overhead or for repetitive movements of over four times per minute. R. 250, 258. He diagnosed post-traumatic arthritis. R. 258.

An x-ray of her right shoulder taken September 15, 2004 was normal. R. 310.

On September 21, 2004 a consultative examination was performed by Singh Dilgagh, M.D. R. 307. Ms. Abrams reported that she took Ibuprofen for pain. It was noted that she was tender at the AC joint and had a limited adduction range of motion. Although her left arm was described as normal, the range of motion in her right arm was limited, especially around the shoulder area. R. 308. He noted no neurological deficits and noted that she had chronic shoulder pain and "limitation with her job activities." R. 308.

On October 27, 2004, the state agency review analyst opined that Ms. Abrams had a residual functional capacity for light work. R. 323-329.

On December 7, 2004, Dr. Vaccaro noted that Ms. Abrams had a severely decreased range of motion, neck pain, and left shoulder pain. R. 362. He ordered x-rays, dated December 9, 2004, which as to her right shoulder showed post operative changes with no evidence of fracture, dislocation, or bone texture abnormality. R. 358. As to her left shoulder, the x-rays showed a narrowing of the acromiohumeral distance which was suspicious for a rotator cuff tear. R. 358. No other abnormalities were noted. R. 358. The x-rays of her cervical spine showed changes of cervical spondylosis at the C5-6 and C6-7 levels. R. 342. The cervical alignment was normal, with no evidence of intervertebral foraminal encroachment. R. 342. There was no of evidence of fracture or encroachment of the cervical spine. R. 342.

On December 17, 2004, Ms. Abrams was examined by David H. Johe, M.D. R. 357.

She complained of neck pain which radiated down into her left shoulder. On examination Dr. Johe reported that her arms had no neurologic deficit, normal motor function, normal and full range of motion of all joints, and normal grip strength. R. 357. She also had full range of motion of her cervical spine. R. 357. He noted that the x-rays indicated mild degenerative changes in her lower vertebral disc spaces and that the AC joint in her right shoulder looked pretty good. R. 357. He advised Ms. Abrams that she was able to use her right arm effectively, that she did not need any additional surgery, and that she should continue obtaining medications from her family doctor. R. 357.

On January 21, 2005, Dr. Vaccaro opined that she had a left rotator cuff tear, although her neck pain was better. R. 361.

On August 30, 2005, Dr. Johe again saw Ms. Abrams. He reported that she had a full range of motion of both shoulder joints; he therefore was of the opinion that she did not have a left rotator tear. R. 356.

On November 15, 2005, Ms. Abrams was seen by Shabir Bhayani, M.D., complaining of shoulder and neck discomfort. R. 355. Dr. Bhayani noted weakness in her bilateral rotator cuffs, a full range of motion of her left shoulder, with minimal pain and no numbness or tingling down either arm. R. 355. Ms. Abrams exhibited tenderness with range of motion of her neck in all directions, but no tenderness to palpation of her cervical spine. R. 355. An MRI of her left shoulder revealed supraspinatus tendinosis with no evidence of a complete rotator cuff tear or impingement. R. 355. There was a bone cyst in the proximal metaphysic of the humerus. R. 355. The MRI of the cervical spine showed a small left paracentral herniated disc at C5-6 R. 355. He noted that the central canal is moderately narrowed at that level, secondary to degenerative disc disease at the posterior facet arthritis. R. 355. There was also a mild central canal stenosis at the C6-7 secondary to degenerative disc disease and facet arthritis. R. 355. He assessed her with a left C5-6 herniated nucleus pulposus and recommended an EMG nerve conduction velocity and gave her neck exercises to complete. R. 355.

At a follow-up exam with Dr. Bhayani on December 20, 2005, he reported that her EMG

and nerve conduction velocity studies showed no evidence of any nerve root impingement or cervical radiculopathy. R. 354. On examination, Ms. Abrams exhibited paraspinal muscle tenderness in the trapezial and sternocleidomastoid area. R. 354. She had a mildly positive impingement sign and mild weakness in external rotation. R. 354. Most of her symptoms appeared to be in the muscular area of her neck. R. 354.

On January 31, 2006, Ms. Abrams was again seen by Dr. Bhayani. She reported that she had been exercising on her treadmill, which alleviated some of her symptoms. R. 354. She complained of pain around the paraspinal muscle area. R. 354. Examination of her left shoulder revealed good range of motion and strength, with only a mildly positive impingement sign. R. 354. She had trapezial and paraspinal tenderness. R. 354. Dr. Bhayani also noted limitation of movement of her right shoulder secondary to her surgeries. R. 354. She had no focal neurologic deficit. R. 354. Dr. Bhayani recommended conservative treatment with neck exercises and a strengthening program. R. 354. He further recommended that she avoid abduction-overhead type activities and should contact him if her symptoms worsen. R. 354.

### B. Plaintiff's testimony

Ms. Abrams testified that she lives with her husband, drives twice a week to her mother's house but she cannot drive far. R. 43-44. She estimated that she has driven twice a week since 2000, the year she was laid off allegedly due to her injuries. R. 44. She collected unemployment compensations for six months after her last day of work (May 2, 2000). R. 45. She cooks two to three times a week, washes dishes and is able to do laundry. R. 49. She is able to vacuum and sweep but she cannot mop. R. 49. She is able to shop. R. 49. She spends most of the day and evening on the couch, watching television and occasionally trying to do housework. R. 46-47. She socializes occasionally once a month, visiting friends. R. 48. She visits her mother twice a week. R. 48.

Ms. Abrams further testified that she is able to put some flowers in the garden. R. 50. She has no problems walking, standing, kneeling or sitting, but that bending affects her neck if she bends for over ten minutes. R. 51. She estimated that with difficulty she can lift and carry

up to 20 pounds with her right and left hand. R. 51. She reported that she is able to open things but has a hard time doing so. She further testified that she has no problem reaching, stooping, or climbing stairs. R. 52. She is unable to do any overhead reaching with her right arm and cannot push or pull. R. 52, 56.

Ms. Abrams further testified that she tosses and turns at night and wakes up frequently. R. 57. Her shoulder is sensitive to touch. R. 57. She stated that she could only type for 10-20 minutes before she suffered pain in her shoulder. R. 58. She stated that repetitive motion is the worst thing for her. R. 52. She takes Ibuprofen for pain in her arm, which she experiences four times a day at a level 6-8 out of ten. R. 54. With Ibuprofen she estimated her pain is at a level 5 out of 10. R. 54. For her herniated cervical disc, Ms. Abrams is prescribed Soma, which she only takes when her neck starts to tighten up or feels like it is going out of place (2-3 days per week). R. 53, 55. She also explained that her shoulder becomes stiff from thunderstorms, air conditioning, or drafts. R. 56.

Ms. Abrams' son, John Snyder, also testified at the hearing. He is a college student who lives in a residence separate from his mother, in Bradford, Pennsylvania. R. 60-61. He goes to his mother's home to wash the bath tub, walls, dog, and to move heavy objects and sometimes, sweep. R. 60. He also drives several times a month, whenever Ms. Abrams needs to travel long distances. R. 60. He occasionally helps in the garden and does the yard and outdoor work. R. 60.

## C. The Vocational' Expert's testimony

The vocational expert ("VE") testified that Ms. Abrams's past relevant work as an assembler, small products, was light in exertion and unskilled. R. 63. The ALJ asked the VE to assume a hypothetical individual with the same vocational profile as Ms. Abrams, who was limited to lifting no more than 20 pounds below shoulder height, no overhead activity, and no repetitive use of the right arm. R. 67-68. The VE testified that such a hypothetical individual would be capable of performing the light exertional jobs of an inspector in the candy production industry (approximately 144,00 jobs in the national economy), an information clerk

(approximately 70,000 jobs in the national economy), and an unskilled officer helper

(approximately 299,000 jobs in the national economy) R. 65-66.

## IV. ALJ's Decision

In summary, the ALJ found that based on Ms. Abrams's exertional limitations and her

age, education, and work experience, Ms. Abrams is not under a "disability." R. at 24-25. The

ALJ undertook the five-step sequential evaluation in determining that Ms. Abrams was not

disabled. The ALJ made the following findings:

> (1) that Ms. Abrams had not engaged in substantial gainful activity since May 1, 2000. R. 18;
>
> (2) that Ms. Abrams suffers from severe impairments: right upper extremity disorder; cervical spine disorder and left shoulder – mild impingement. R. 18.;
>
> (3) that she does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments set forth in 20 C.F.R. Pt. 404, SubPart P, Appendix 1, Regulations No. 4 (specifically, musculoskeletal system). (R. 18);
>
> (4) although unable to perform any past relevant work, which was at a medium level of exertion, she retains the residual functional capacity to perform light unskilled work which would allow her to avoid lifting over 20 pounds below shoulder height, no repetitive use of the right arm, and no overhead activity. R. 19-21, 24-25;
>
> (5) based on her RFC and the VE testimony, Ms. Abrams was able to perform jobs that exist in significant numbers in the national economy. R. 24-25.

## V. Discussion

We find that the ALJ's decision that Ms. Abrams is capable of performing a limited

range of light work, despite her impairments, is supported by substantial evidence.

Ms. Abrams argues that the ALJ erred in a number of ways. (Doc. 12). Essentially, she argues

that: 1) the ALJ's decision is not supported by substantial evidence ; 2) the opinion of the VE did

not adequately consider her physical limitations or the job market where she resides; 3) ALJ's

erred in her residual functional capacity assessment; 4) the ALJ erred in finding that her

subjective complaints of pain were not supported by the record.

We note the following results of medical testing. The x-rays of plaintiff's right shoulder

in September and December 2004 were fairly normal, reflecting post-operative changes with no

evidence of fracture, dislocation, or bone texture abnormality. R. 310, 358. X-rays of Ms. Abrams' cervical spine showed mild degenerative changes. R. 342, 357. An MRI of her left shoulder dated November 2005 showed tendinosis but no evidence of a complete rotator cuff tear or impingement. R. 355. Indeed, the MRI of her cervical spine showed mild central canal stenosis at the C6-7 level, the EMG and nerve conduction velocity studies showed no evidence of any nerve root impingement or cervical radiculopathy. R. 354-55.

The Commissioner aptly highlights the fact that from October of 2000, five months after her alleged onset date, Ms. Abrams sought no treatment for her right shoulder until after she filed her claim for disability benefits in 2004. In September 2004, Dr. Dilgagh reported that examination of her left arm was normal and despite a limited range of motion in her right arm she had no neurological deficits. In December 2004, Dr. Johe likewise reported that her arms had no neurological deficit, with a normal and full range of motion of all joints, and normal grip strength. R. 357. She had full range of motion of her cervical spine. Dr. Johe also remarked that, because she had full range of motion of her left shoulder joint, she could not possibly have a torn left rotator cuff. R. 356. Dr. Bhayani similarly noted in November 2005 that she had full range of motion of her left shoulder, with minimal pain. R. 355. Later, in January 2006, Dr. Bhayani reported that she had no focal neurologic deficit, some limitation of motion in her right shoulder secondary to her surgeries, and good strength and range of motion in her left shoulder. R. 354.

None of her treating or examining physicians expressed an opinion that Ms. Abrams was permanently disabled from working. Early on, Dr. Vaccaro did suggest she remain off work for one month, beginning in April of 2000. In October 2000, Dr. Williams thought she should limit her activities to no lifting of anything heavier than 20 pounds below her shoulder height, 10 pounds above her shoulder height, no more than occasional use of her right arm overhead, and no use of her right arm for repetitive activities. R. 258. This assessment was less restrictive than the limitations found by the ALJ, who limited her to no overhead activity. R. 19. In December, 2004, Dr. Johe opined that Ms. Abrams was able to use her right arm effectively, without any

9

restriction. R. 357.

We find that the ALJ's residual functional capacity assessment was not simply conclusory and provided a proper analysis as required by SSR 96-8p. In making her determination as to Ms. Abrams' residual functional capacity, the ALJ reviewed her testimony, medical records, her complaints of pain, the various medical opinions contained in the record, and Ms. Abrams' other subjective complaints. See R 19-24. She then evaluated all of this information, explaining what evidence in the record supported his analysis. R.19-24. As such, the ALJ's residual functional capacity assessment was not conclusory and sufficiently complied with the mandates of SSR 96-8p.

With regard to determining Ms. Abrams's residual functional capacity the ALJ considered "all relevant evidence." Fargnoli, 247 F.3d at 40 (citing 20 C.F.R. §§ 404.1527(e)(2), 404.1545(a), 404.1546); Burnett, 220 F.3d at 121). The ALJ incorporated certain aspects of Dr. Williams' RFC assessment into his own RFC assessment. He explained that Dr. Johe found no torn rotator cuff, that Dr. Bhayani determined that she had a mild left positive impingement and to her to avoid overhead activity, and that the was giving great weight to the residual functional capacity of Dr. Bhayani, a treating physician. R. 22.

There was no error in this regard. Treating physicians' reports should be accorded great weight, especially "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Rocco v. Heckler, 826 F.2d 1348, 1350 (3d Cir. 1987); 20 C.F.R. § 404.1527(d)(2). "Under applicable regulations and the law of this Court, opinions of a claimant's treating physician are entitled to substantial and at times even controlling weight." Fargnoli, 247 F.3d at 43 (citing 20 C.F.R. § 404.1527(d)(2); and Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)). Nevertheless, an ALJ may reject a treating physician's opinion outright on the basis of contradictory medical evidence, but may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided. Newhouse v. Heckler, 753 F.2d 283, 286 (3d Cir. 1985).

The hypothetical question posed by the ALJ to the vocational expert and relied upon by

the ALJ in concluding that Ms Abrams had the residual functional capacity to work reflected all of her exertional and non-exertional impairments that are supported by the record. "A hypothetical question must reflect all of a claimant's impairments that are supported by the record; otherwise the question is deficient and the expert's answer to it cannot be considered substantial evidence." Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987). The hypothetical question posed by the ALJ to the vocational expert upon which the ALJ ultimately relied in deciding the Ms Abrams' residual functional capacity was: "Able to lift 20 pounds but carry 10. No pushing or pulling at all. No use of the right upper extremity or involving the shoulder more than four times a minute. No turning of the head frequently. No overhead work." R. 67.

Finally, the ALJ found that Ms. Abrams's statements concerning the intensity, persistence and limiting effect of her symptoms were not entirely credible. Ms. Abrams testified that her impairments left her unable to do virtually any activities and that she spent nearly the entire day sitting on the couch watching television. It is the responsibility of the ALJ to make credibility determinations. Smith v. Califano, 637 F.2d 968, 972 (3d Cir. 1981); Baerga v. Richardson, 500 F.2d 309, 312 (3d Cir. 1974), cert. denied, 420 U.S. 931 (1975). The ALJ's credibility determination is entitled to deference by this Court. See Van Horn v. Schweiker, 717 F.2d 871, 873 (3rd Cir. 1983); Reefer v. Barnhart, 326 F.3d 376, 380 (3d Cir. 2003). The ALJ, as the finder of fact, can reject, partially or fully, subjective complaints if he finds them not credible based on other evidence in the record. See Baerga v. Richardson, 500 F.2d 309, 312 (3rd Cir. 1974).

"If the ALJ determines that the claimant's subjective testimony is not fully credible, the ALJ is obligated to explain why. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir.2002) (quoting Burnett, 220 F.3d at 120). The ALJ may reject subjective complaints "if he affirmatively addresses the claim in his decision, specifies the reasons for rejecting it, and has support for his conclusions in the record." Matullo v. Bowen, 926 F.2d 240, 245 (3d Cir. 1990). When the ALJ is faced with conflicting evidence, "he must adequately explain in the record his reasons for

11

rejecting or discrediting competent evidence." Sykes v. Apfel, 228 F.3d 259, 266 n.9 (3d Cir. 2000)(quotations and citations omitted). A district court need not defer to the ALJ's credibility determinations that are not supported by substantial evidence. Smith, 637 F.2d at 972; Baerga v. Richardson, 500 F.2d 309, 312 (3d Cir. 1974).

We find that there is substantial evidence to support the ALJ's rejection of subjective complaints. The ALJ properly found that Ms. Abrams' complaints and asserted limitations were not fully credible because they were out of proportion to the objective evidence, the reports of her treating physicians, and the nature and extent of the medical treatment that she sought and received. R. 23. Her physicians opined that she was at least capable of performing a limited range of light work. R. 258, 357.

Finally, with respect to Ms. Abrams' assertion that the ALJ erred in finding that she could find a job in the limited job market where she resides, we note that this is not required by the regulations.

### § 404.1566 Work which exists in the national economy.

(a) General. We consider that work exists in the national economy when it exists in significant numbers either in the region where you live or in several other regions of the country. It does not matter whether--

   (1) Work exists in the immediate area in which you live;

   (2) A specific job vacancy exists for you; or

   (3) You would be hired if you applied for work.

20 C.F.R. § 404.1566(a)(1)-(3).

## VI. Conclusion

The ALJ did not err in deciding that plaintiff Brenda P. Abrams could perform a significant number of jobs in the national economy and thus, was not disabled. The ALJ's decision as a whole is supported by substantial evidence in the record. To that end, plaintiff's

motion for summary judgment is denied and defendant's motion for summary judgment is granted. The decision of the ALJ is affirmed.

An appropriate order will be entered.

September 29, 2010
Date

Maurice B Cohill, Jr.
Hon. Maurice B. Cohill, Jr.
Senior United States District Court Judge